Anderson, J.,
delivered the opinion of the court.
Charles Moore, the testator of appellees, held the joint and several obligation of Samuel A. Coffman and others for a debt of $13,800, upon which he brought suit against all the obligors, except one who had died, obtained judgment and sued out execution. This bill was brought by three of the said obligors, the appellants, to enjoin the judgment and execution, upon the ground that they executed the bond merely as sureties for Samuel A. Coffman, and were released from the obligation by the conduct of the creditor.
The law is well settled in Virginia, that the obligors, in a joint obligation, are alike bound to the creditor as principals, whatever may be the relations between themselves as principal and surety. The obligation of all and each of them to the creditor is absolute and unconditional; and there is no obligation of diligence on the part of the creditor to either of them. In the language of Baldwin, J., in Humphrey v. Hitt, 6 Gratt. 523, “it is the duty of the surety, as well as the principal, to see to the payment of the money, and the forbearance of the creditor is a tacit indulgence given to both, in which the acquiescence of the one is equally significant with that of *the other.” He has no equity against the creditor on the ground of his relation of surety to the principal debtor. But he has equities and remedies against his principal. He may pay the debt and have his action or motion against him for reimbursement; or, if he is apprehensive of loss by the delay of the creditor, he may file his bill in chancery against the principal, to compel him to pay the debt; or he may file his bill in equity against the creditor, to compel him to sue, upon being indemnified against the consequences of risk, delay and expense; or he may, by written notice under the statute (Code of 3 873, ch. 114, §§ 4 and 5), be released from his *424 liability.if the creditor, after the service of the notice, should unreasonably delay to institute suit, or fail to prosecute the same with due diligence to judgment and by execution. He is entitled to these remedies against his principal, in order that he may be indemnified and saved harmless on account of his vol-tary undertaking in his behalf; and if the creditor acts in a way to deprive him of these remedies against his principal, he releases him from his obligation. Hence, if the creditor makes a binding agreement with the principal debtor1to extend the time of payment without the consent of the surety, he makes a new contract with the principal, whereby the surety is deprived of his remedies against the latter during the suspension. A proceeding by notice under the statute would be unavailing to him. He is deprived of his remedy in the meantime, by bill quia timet, and he cannot, even by payment of the debt, proceed against his principal to be reimbursed by action or motion. Accordingly it is held that the creditor, by tieing up his hands by a contract with the principal debtor to extend the time of payment for ever so short a period without the sureties consent, absolves the surety from his obligation, without *even an inquiry as to the amount of loss he has sustained.
It is also held that the surety, as against his principal, is entitled to all the securities which the latter has given the creditor for the purpose of reimbursing him, if he has paid the creditor, and, if he has not, for” the purpose of having it paid for his own protection. The surety has a right to stand in the shoes of the creditor in the enforcement of ' such securities; and the creditor, as to such securities in -his hands and under his power, ¡s considered as trustee for the surety, and if he is unfaithful, he not only fails in his duty as trustee, but violates the rights of the surety as 'against his principal, and is liable for the loss which the surety thereby sustains. These principles are firmly established by repeated decisions of this court. I need only refer to the following cases: Ward v. Johnson, 6 Munf. 6; McKinney's ex’or v. Waller, 1 Leigh, 434; Alcock v. Hill, 4 Leigh, 622; Humphrey v. Hitt, 6 Gratt. supra, in winch Judge Baldwin, with the unanimous concurrence of the other judges sitting, gives a clear and forcible exposition of the doctrines on this subject. Then follows Hansbarger adm’r v. Kinney, 13 Gratt. 511; and the recent cases of Shannon v. McMullin, 35 Gratt. 211; Harrison’s ex’or & als. v. Price’s ex’or & als., Ibid. 553.
The doctrines of the law, as enunciated, are so firmly settled in Virginia that we deem it unnecessary to pursue the inquiry outside of our own courts; but will.proceed to inquire how far they are applicable to the case in hand. The appellants who claim to have executed the obligation merely as sureties of Samuel A. Coffman, rely upon an article of agreement which was entered mto .on the 17th of June, 1870, between Samuel A. Coffman and M. D. Coffman of the one part, and Charles Moore of the other, for the sale and purchase of a farm as absolving them from these obligations. *Does this paper.evidence a contract, whereby Charles Moore bound himself to suspend suit or action on the bond for a day or an hour? The vendors agreed to sell him the farm at a fixed ascertained price, fifty dollars an acre, in the' present currency, the whole to be due on the 1st of September next (1870), at which time the vendors agreed to give possession. After some other stipulations' not important to notice, it provides as follows: “The said Coffmans hereby agree, that the said Moore shall pay all claims that are binding on the land intended to be sold by this agreement, and the claims that said Moore holds against the said Coffmans; and the said Coffmans agree to receive as money a note that the said moore holds against the estate of Colonel John H. Hopkins, deceased.” This is the clause relied on by the appellants to make good their claim. There can be no question that it gives the privilege to the vendee to retain the debt due himself, out of the purchase money, in the execution of the contract. But does it limit him to that means of collecting his debt? Does he, by the terms of this clause, covenant or agree that he will suspend the right of action, to recover the debt until the first of September, or for an hour? We may presume that he would, by reason of it, consider it unnecessary to sue, ahd would not be likely to sue. But did he bind himself not to sue? He may not have deemed it necessary to sue, and have been disposed to await the result of this executory contract for the purchase of the land, with the hope and expectation that it would be satisfactorily executed; as in that event, it would be unnecessary to sue. But did he bind himself not to sue in the meantime?
If he had received written notice under the statute froni the solvent sureties to sue, so that the question was presented to him, to surrender the ample security he had *already for the debt, by failing to sue, and. to rely alone upon a contract of-sale, which was not recorded, and not witnessed or acknowledged so as to be recorded, and which was uncertain in its execution, or to sue, can there be any question as to what his'determination would have been? And to have elected to sue, under those circumstances, would have been, we think, no violation of any legal or moral obligation. By entering into this incomplete and executory contract for the land, he did not intend a surrender of any subsisting security he held, (hence he retained in In's own hands the bonds he held against them), before he got a title, or knew that it would in his power to get a title. If such had been the intention of the parties, we think it would have been so expressed. We are of opinion, therefore, that a contract, to the effect that he would surrender the security he had, by obligating himself to give the principal debtor further time for its payment, until the 1st of September, 1870, cannot be implied from the face of the article, or the surrounding circumstances. And for the same reasons we think there is nothing in the agreement which would have precluded the sureties from filing their bill quia timet, *425 either against the principal debtor or the creditor.
But it was argued with some apparent earnestness by appellants’ counsel, that if the money had been tendered to Charles Moore, by the sureties, after he entered into this agreement, he could not have honestly received it. Why not? As we have seen, he never agreed and bound himself to postpone the collection of his debt. Coffmans agreed, that he should pay it out of the purchase money. That was a privilege to him as we construe the article. It does not appear that it was then known what was the amount of liens upon the land; and if it was, it certainly was not known what would be *the amount of liens by the 1st of September. The vendors seem to have been largely indebted, above the price of the land. The liens had been greatly augmented before the 1st of September. They are reported by the commissioner to have amounted to $64,577.70 on the ]5th of September, 1872; whilst he reports only 638)4 acres of land, which at $50 an acre would have amounted to only $31,937.50, which would not have paid fifty cents in the dollar of the liens, with which it was charged at the date designated in the report. Whether there was anything to prevent, at the date of this contract, the creditors for the larger portion of this debt from acquiring judgment liens before the 1st of September, 1870, the record does not show. Suppose they had acquired liens to the amount of $31,937, the price of the farm, the vendee would have been obliged to have discharged those liens, in order to clear the title from incumbrance. And that he had the privilege of doing by the express agreement of the vendors. It would hardly be contended that he would have to surrender his debt too. He assumed no such obligation. It was only a privilege accorded to him, of paying the purchase money with the Coffman bond, and the bond of Hopkins which he held. And if the sureties had, at any time after the said article of agreement had been entered into, tendered payment to him, he having informed them of said article of agreement, and he had received the money from them, it would have violated no contract between him and his vendors, and in fact would not have prejudiced them. There is, therefore, nothing in the said articles of agreement between the creditor and the principal debtor which infringes on or impairs the equities or rights and remedies of the sureties against the latter.
Nor did the debtor thereby acquire securities which he was bound to apply in the exoneration of the sureties *from their liability for his debt, it was a contract which he had entered into with Samuel and M. D. Coffman for the purchase of their farm, and, although they agreed to receive the debt for which the appellants were bound as sureties for Samuel Coffman, on the completion of the contract in part payment of the purchase money, it was only a privilege as we have seen, accorded to the vendee, and was a transaction entirely aside from and independent' of the obligation in question. It was no security for the discharge of that obligation, for it was incomplete and unexecuted, and in fieri, and whether it was ever executed would depend upon the will and pleasure of the parties. They might, at any time, have cancelled it by consent. It was unrecorded, and was not attested nor acknowledged so as to be recorded, and the vendee had no guarantee that the vendors might not convey the same lands to other innocent purchasers. He did not know that other liens might not be acquired on the land before the 1st of September, which would exceed the price he was to pay for. it, or at least not leave enough to pay his (Coffman’s) debt, and the Hopkins’ bond which he held. He did not know that in the embarrassed condition of the vendors, it would be in their power to make him a clear title, free from all encumbrance and embarrassment. If it had been regarded as a security for his debt, there is no reason why his bonds had not been given up at the time in part payment of the purchase money. Why withhold them until the 1st of September, until the agreement was to be consummated, when all the purchase money was to be due and possession delivered, if their payment was already secured? Because until then, there was uncertainty as to whether it would ever be consummated. The' vendors might then refuse to execute the agreement, or the purchaser might feel justified under the circumstances to refuse. The sureties *had no right to complain; they had no right to require the creditor to purchase the land; and they were no worse off than they would have been if the-agreement had never been made. None of their rights had been infringed by it. The expectation of its consummation may have caused the creditor to delay his suit, though he was under no obligation to delay. And the sureties had no right to complain of that. He was under no obligation of diligence to them. When the 1st of September arrived, it seems that he was unwilling to complete the contract of purchase, and for reasons satisfactory to himself, under the facts and circumstances of this case, the sureties had no right to complain. They had, as before said, no right to require him to purchase the land, or to complete the purchase of it, if he were not so disposed; their, rights against the principal debtor not being infringed by his not doing it. The testimony of the plaintiffs in the cause shows that for some time after the purchase it was the bona fide intention of the plaintiff to do what was necessary on his part to be done, in order to its consummation. But when the period for its consummation arrived, the financial embarrassments of the vendors, the augmentation of the liens upon the land since the date of the contract, the large indebtedness of the vendors, the number of suits which were depending against them and pressing them, and the grounds to apprehend that Samuel Coffman would go into bankruptcy, either voluntarily, or involuntarily, which he did a short time after; and the danger of completing the contract *426 and taking a conveyance under such circumstances, of being involved in a suit in the bankrupt court, and of having his conveyance impeached for* fraud in such suit, and the loss of his debt, were well calculated to change his resolution with regard to the purchase of the farm, and to bring him to the conclusion, *in this changed state of the case, to decline to carry out the contract. It does not appear that any tender of executing the contract was made by the vendors, and a refusal on his part On the contrary, they in sixteen days after the 1st of September, utterly incapacitated themselves to make such a tender, by conveying the same property in trust to secure the debts of others, and also utterly and forever from asserting any claim for specific performance, or for damages for non-performance of the contract.
Upon the whole, the court is of opinion that there is no error in the decree of the circuit court, and to affirm the same with costs.
Decree affirmed.